WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Albert Walter Kouba,<br><br>    Plaintiff,<br><br>vs.<br><br>Renzenberger, Incorporated; et al.,<br><br>    Defendants. | No. CIV 10-159 TUC FRZ (GEE)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the court is the a motion for summary judgment filed on February 18, 2011, by the defendant, Renzenberger, Inc. (Doc. 92)

Also pending is a motion to deny defendant's motion for summary judgment, filed on June 21, 2011, by the plaintiff, Albert Walter Kouba. (Doc. 131)

The defendant, Renzenberger, provides crew transportation for the railroad. The plaintiff, Albert Walter Kouba, worked as a driver for Renzenberger. He filed this action for unpaid wages in violation of the Fair Labor Standards Act (FLSA) and for sexual harassment. On February 18, 2011, the defendant, Renzenberger, filed the instant motion for summary judgment. (Doc. 92) On June 21, 2011, Kouba filed in response a motion to deny defendant's motion for summary judgment. (Doc. 131)

The case was referred to Magistrate Judge Edmonds for all pretrial matters pursuant to Local Civil Rule 72.2. Rules of Practice of the U.S. District Court for the District of Arizona.

Factual and Procedural Background

The defendant, Renzenberger, provides crew transportation for the railroad. The plaintiff, Albert Walter Kouba, worked as a driver for Renzenberger from September 2008 to September 2009. (Doc. 92, p. 2)

Kouba worked mostly as a "road driver" transporting rail crews to and from railroad yards and other work locations. (Doc. 92, p. 2) Kouba did not have a specific assignment or drive a specific route. (Doc. 92, p. 5) Instead, he was one of approximately 20 drivers Renzenberger had "on call" each day and available for work assignments. (Doc. 92, p. 5) Available drivers were placed "on the board." (Doc. 92, p. 5) When a job became available, the person in the "number one" position was offered the job, and everyone else on the board moved up one position. (Doc. 92, p. 5)

There was no requirement that drivers be on Renzenberger property while waiting for a job. (Doc. 92, p. 6) They ordinarily received their trip orders by telephone. (Doc. 92, p. 2) If Kouba received the call at home, he would go to the yard and pick up the van and then proceed to the crew pick-up location. (Doc. 92, p. 2) If he had the van at his house, he could drive directly to the pick-up location. (Doc. 92, p. 2) Before starting a trip, however, Kouba was required to perform a pre-trip inspection of the van. (Doc. 92, p. 2)

Renzenberger pays its drivers piece rate. (Doc. 92, p. 2) The piece rate is ordinarily determined by multiplying the trip mileage by the rate of payment. (Doc. 92, pp. 2-3) Sometimes, the mileage is determined directly from the van odometer. (Doc. 92, pp. 2-3) Usually though, the trip mileage is a fixed number determined by agreement between Renzenberger and the railroad for each trip. (Doc. 92, pp. 2-3)

There are a number of exceptions to the piece rate rule. For instance, drivers get extra pay if the piece rate rule would pay them less than minimum wage. (Doc. 92, p. 3) They also get paid "waiting time" if they have to wait for the crew or if the trip is delayed by bad weather. (Doc. 92, p. 3)

Before January 1, 2009, Renzenberger did not pay its road drivers overtime on the assumption that they fell under the Fair Labor Standards Act "motor carrier and/or rail carrier exemptions." (Doc. 92, p. 6) After that date, Renzenberger paid "time and one-half" for work in excess of 40 hours per week. (Doc. 92, p. 6) Renzenberger calculates that Kouba's unpaid overtime in 2008 amounts to $399.00. (Doc. 92, p. 7)

In the complaint, Kouba claims he was not paid overtime in 2008, he was not paid for pre-trip inspections, and he should have been paid "on-call' time when he was in the first or second position on the board.

Kouba maintains he was sexually harassed by his supervisor, Jackie Myers. (Doc. 92, p. 3) Kouba attended new hire training and orientation on September 3rd and 4th of 2008. (Doc. 92, p. 3) While talking and conducting this training, Myers "walked up to him, put her hand on his shoulder, put her body on him, and put her breasts on top of his head." (Doc. 92, p. 3) Kouba believes this was a sexual advance. (Doc. 92, p. 3)

Kouba reported the incident to a fellow employee, Paul Wenzel, but did not notify management as the employee handbook instructed. (Doc. 92, p. 3) He filed a charge of discrimination on June 11, 2010. (Doc. 92, pp. 8-9)

Kouba maintains Myers engaged in other conduct toward him and others that was threatening and abusive. (Doc. 92, p. 4)

On February 8, 2010, Kouba filed a complaint in Pima County Superior Court. (Doc. 2-1) In that complaint, Kouba claims he was not paid overtime in 2008, he was not paid for pre-trip inspections or post-trip refueling, he was not paid for time spent on-call, and he suffered "sexual harassment and sexual discrimination." (Doc. 2-1). On March 15, 2010, the action was removed to this court.

The corporate defendant, Renzenberger, filed an answer on March 22, 2010. The individual corporate officer defendants filed a motion to dismiss on March 22, 2010, that was granted by the court on December 21, 2010.

On February 18, 2011, Renzenberger filed the instant motion for summary judgment and accompanying statement of facts. (Docs. 92, 93)

On March 21, 2011, Kouba filed a document entitled Motion to Deny Defendant's Motion for Summary Judgment to Include Punitive Damages – With Declaration of Plaintiff [;] This Motion is not the Reply to Defendant's Motion for Summary Judgment on any Genuine Dispute of any Material Fact. (Doc. 104) The court construes this filing as a response to the defendant's motion for summary judgment. Renzenberger filed a response on April 4, 2011, explaining it did not file a motion for summary judgment on the issue of punitive damages. (Doc. 110)

On June 21, 2011, Kouba filed Plaintiff's Motion to Deny Defendant's Motion for Summary Judgment with Disputed Facts, and with Declaration of Plaintiff. (Doc. 131) The court construes this filing also as a response to the defendant's motion for summary judgment.

On August 25, 2011, Renzenberger filed its reply. (Doc. 142)

Previously, on July 12, 2011, Kouba filed "Plaintiff's Motion to Addendum a Few Statements and Exhibits to Plaintiff's Motion to Deny Defendant's Motion for Summary Judgment." (Doc. 135)

Renzenberger responded with "Defendant's Motion to Strike, and/or Opposition to 'Plaintiff's Motion to Addendum a Few Statements and Exhibits.'" (Doc. 137) Renzenberger moves that the motion and accompanying addendum be stricken because the filing is not authorized by the local rules, it is untimely, and because Kouba's "Motion to Deny Defendant's Motion for Summary Judgment" already exceeds the applicable page limit by 106 pages.

Kouba did not file a response. According, the motion to strike should be granted. *See* LRCiv 7.2 (i).

On August 12, 2011, Kouba filed what appears to be a sur-reply to Renzenberger's reply brief, which at that time was merely lodged rather than filed. (Doc. 142)

Renzenberger responded with a Motion to Strike because a sur-reply is not authorized by the local rules. (Doc. 143) Renzenberger is correct. Accordingly, this motion should be granted.

Standard of Review:  Summary Judgment

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The initial burden rests on the moving party to point out the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party has the burden of proof at trial, that party carries its initial burden by presenting evidence showing no reasonable trier of fact could find for the nonmoving party. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991). If the moving party does not have the burden of proof at trial, that party carries its initial burden either by presenting evidence negating an essential element of the nonmoving party's claim or demonstrating the nonmoving party cannot meet its burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Nissan Fire & Marine Insurance v. Fritz*, 210 F.3d 1099 (9th Cir. 2000).

Once satisfied, the burden shifts to the opponent to demonstrate through production of probative evidence that an issue of fact remains to be tried. *Celotex,* 477 U.S. at 324. "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule– set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's

case, and on which that party will bear the burden of proof at trial." *Thomas v. Douglas*, 877 F.2d 1428, 1430 (9th Cir. 1989).

When considering a motion for summary judgment, the court is not to make credibility determinations or weigh conflicting evidence. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990). Instead, the court should draw all inferences in the light most favorable to the nonmoving party. *Id.*

DISCUSSION: Hostile Work Environment

"Under Title VII, it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of his race, color, religion, sex, or national origin." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003); *see* 42 U.S.C. § 2000e-2(a)(1). "To prevail on a hostile workplace claim premised on either race or sex, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Id*.

"To determine whether conduct was sufficiently severe or pervasive to violate Title VII, [the court will] look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (punctuation modified) "In addition, the working environment must both subjectively and objectively be perceived as abusive." *Id.* (punctuation modified)

- 6 -

Kouba claims he suffered a hostile work environment because of his sex.[1] Specifically he claims his supervisor, Jacqueline Myers, made a sexual advance while she conducted his new hire training course. Subsequent to that incident, he alleges she screamed at him, berated him, and threatened to fire him on numerous occasions.

Renzenberger argues it is entitled to summary judgment because Kouba's EEOC claim was untimely, the alleged harassment was not because of the plaintiff's sex, and the conduct was not severe or pervasive. (Doc 92, pp. 8-12) Renzenberger further asserts it is entitled to summary judgment based on the *Farragher/Ellerth* affirmative defense. *Id.*

Kouba presents evidence of only one incident in which he was subjected to conduct clearly of a sexual nature. On September 3 and 4, 2008, Kouba attended a new hire orientation/training that was conducted by the Regional Manager, Jackie Myers. (Doc. 93, ¶¶ 29, 31) During that training, Myers "walked up to him, put her hand on his shoulder, put her body on him, and put her breasts on top of his head." (Doc. 93, ¶ 32) She did not speak to Kouba, but simply continued to conduct the training. (Doc. 93, ¶ 33) Kouba moved forward "to get away from the contact." (Doc. 93, Exhibit 1, p. 104) The incident lasted 15 to 20 seconds. (Doc. 93, ¶ 24)

After the incident, Kouba alleges Myers subjected him to an "evil and hostile work environment." (Doc. 131, ¶¶ 222, 247, 252) He alleges Myers manipulated his "spot on the board" and "took trips away from me." (Doc. 131-3, ¶ 40) Once, she acted "like a woman who had gone berserk, off her head, screaming and screaming at Plaintiff over some tiny nothing." (Doc 131, ¶ 257) Another time, Myers threatened "to fire Plaintiff, saying to him most vulgar

---

[1] Kouba states in various places that he suffered "retaliation" at the hands his supervisor, Jackie Myers. It appears that he is using this word in accordance with its ordinary meaning: She retaliated against me because I rebuffed her sexual advance. He does not appear to be asserting a claim for retaliation pursuant to 42 U.S.C. § 2000e-3(a) which makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed . . . an unlawful employment practice . . . , or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

- 7 -

words forbidden by company policy, as she was screaming at Plaintiff she did not care if Plaintiff pissed or shit." (Doc. 131-3, ¶ 295) He alleges Myers fired him because he had a minor accident even though other drivers were not fired after having more severe accidents than he had. (Doc 131-3, ¶ 51)

Unfortunately, while Kouba provides ample evidence that his supervisor was insulting and demeaning, he provides no evidence that her behavior toward him after the training incident was on account of his sex. In other words, he does not show that Myers treated him poorly because he was a man and not a woman. *See Brown v. Henderson*, 257 F.3d 246, 253-54 (2nd Cir. 2001) ("[W]hat matters in the end is . . . how the employer *would have* treated *the plaintiff* had she been of a different sex.") (emphasis in original).

In fact, Kouba testified that Myers mistreated almost everybody. He stated that "[b]asically, everybody [was] being bullied by her, pretty much the whole staff in many cases, let's put it that way." (Doc. 93, ¶ 43) He further stated that, "I have spoken with many drivers, employees of Renzenberger, at the Tucson, Arizona location about how we have all been harassed and discriminated against." (Doc 93, ¶ 44) While he accuses Myers of manipulating his position on the board, he testified that she "was doing this constantly to all of us drivers." (Doc. 93, ¶ 45)

Kouba argues that Myers' boorish treatment of him was the result of his rebuffing her sexual advance at the new hire training, but aside from his suspicions he provides no evidence that this was so. *See* (Doc. 131, ¶ 315) He offers no evidence that Myers ever mentioned the training incident again after his alleged rebuff. He alleges she screamed at him often but does not suggest that she employed language calculated to humiliate him because of his sex. *See, e.g., Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994) ("It is one thing to call a woman 'worthless,' and another to call her a 'worthless broad.'"). Kouba conceded that Myers could have been motivated, at least in part, by reasons that had nothing to do with his sex. When asked to explain Myers' behavior toward him, he stated, "I'm not saying so much

1  as a man, just anyone strong-willed to tell her anything, but it was a personality thing against
2  me, standing up to her, willing to tow the line." (Doc. 93, ¶ 50); *see also* (Doc. 131, ¶ 291)

3  Kouba provides no evidence that Myers' abusive behavior after the training incident was
4  of a sexual nature. Those incidents therefore will not be included in the hostile workplace
5  analysis. Accordingly, to support his claim he presents evidence of only one incident of
6  unwelcome physical conduct over a one-year period. This incident was of limited duration and
7  while offensive and possibly humiliating, it does not appear to have been physically threatening
8  or so extreme as to have interfered with Kouba's subsequent work performance. As a matter
9  of law, this single incident is not severe or pervasive enough to constitute an abusive work
10 environment. *See, e.g., Bowman v. Shawnee State University*, 220 F.3d 456, 458-59, 464-65(6th
11 Cir. 2000) (Supervisor's harassment was not sufficiently severe and pervasive because while
12 the plaintiff alleged three incidents of offensive touching and two offensive propositions over
13 a three and one-half year period, the bulk of his supervisor's offensive conduct had nothing to
14 do with his sex.); *Quinn v. Green Tree Credit Corp*., 159 F.3d 759, 767-68 (2nd Cir. 1998)
15 (Supervisor's harassment was not sufficiently severe or pervasive where the plaintiff made only
16 two timely allegations: the supervisor "told [her] she had been voted the 'sleekest ass' in the
17 office" and on another occasion, he "deliberately touched [her] breasts with some papers that
18 he was holding in his hand."), *abrogated in part on other grounds by Nat'l R.R. Pass. Corp., v.*
19 *Morgan*, 536 U.S. 101, 122 S.Ct. 2061 (2002); *see also Mendoza v. Borden, Inc*., 195 F.3d
20 1238, 1246-47 (11th Cir. 1999) (collecting cases). Renzenberger's motion for summary
21 judgment on Kouba's sexual harassment claim should be granted.

22 In the alternative, the court finds that summary judgment should be granted because
23 Kouba's EEOC claim was untimely.

24 "A person seeking relief under Title VII must first file a charge with the EEOC within
25 180 days of the alleged unlawful employment practice, or, if, as here, the person initially
26 instituted proceedings with the state or local administrative agency, within 300 days of the
27 alleged unlawful employment practice." *Surrell v. California Water Service Co.*, 518 F.3d 1097,
28
- 9 -

1104 (9th Cir. 2008) (citing 42 U.S.C. § 2000e–5(e)(1)); *see also Lee v. Arizona*, 2011 WL 2580400, n. 6 (D.Ariz. 2011). If the person is bringing a hostile work environment claim, at least one of the acts contributing to the claim must occur withing the filing period. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 2074 (2002).

"If the EEOC does not bring suit based on the charge, the EEOC must 'notify the person aggrieved' that she can file suit." *Surrell*, 518 F.3d at 1104 (citing § 2000e–5(f)(1)). "The notice is accomplished through a right-to-sue letter." *Id*. "Once a person receives an EEOC right-to-sue letter, she has 90 days to file suit." *Id*. (citing § 2000e–5(f)(1)).

In this case, Kouba filed his charges with the EEOC on June 11, 2010. (Doc. 92, pp. 8-9) He filed his charges more than 300 days after the training incident with Myers on September 3rd or 4th of 2008, which is the only incident that evinces sexual discrimination. Kouba's claim pursuant to Title VII, therefore, must be dismissed as untimely.

Kouba argues that Myers engaged in other incidents of "harassment" within the 300 day window, but as the court explained above, he provides no evidence that these incidents were motivated by his sex.

The court finds, in the alternative, that Renzenberger's motion for summary judgment on Kouba's Title VII claim should be granted because the charge was not timely filed. The court does not reach Renzenberger's alternate arguments related to this claim.


Discussion: On Call

"FLSA [Fair Labor Standards Act] 29 U.S.C. § 207(a)(1) requires overtime compensation for hours worked beyond 40 per week." *Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992). The Supreme Court has held that time spent waiting for work is compensable if the waiting time is spent primarily for the benefit of the employer and his business. *Id*. (punctuation modified). "Whether time is spent predominately for the employer's benefit is dependent upon all the circumstances of the case." *Id*. (punctuation modified). "For example, facts may show that the employee was

- 10 -

'engaged to wait,' which is compensable, or they may show that the employee 'waited to be engaged,' which is not compensable." *Id.* (punctuation modified).

"[T]he Court has directed us to scrutinize and construe the agreements between the particular parties, appraise their practical construction of the working agreement by conduct, consider the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances." *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 935-936 (9th Cir. 2004) (punctuation modified). "[T]he two predominant factors in determining whether an employee's on-call waiting time is compensable overtime are (1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties." *Id.* (punctuation modified)

In this case, the parties had an agreement that the drivers would not be paid for on-call time. Kouba argues that he never affirmatively accepted this rule, but that is not what the term "agreement" means in this context. (Doc. 131, p. 67) Here, the term means that the drivers knew they would not be paid for on-call time and accepted the job anyway. *See Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers*, 971 F.2d 347, 354-55 (9th Cir. 1992). Kouba concedes Renzenberger never offered to pay its drivers for their on-call time. (Doc. 131, p. 59) This agreement is some evidence that the parties believed on-call time was not work. *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 939 (9th Cir. 2004). The court now considers the degree to which the drivers were free to engage in personal activities.

"In *Owens*, [the Ninth Circuit] enumerated an illustrative list of factors to consider in gauging the extent to which employees could pursue personal activities during the course of their on-call shifts: (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether the use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time." *Brigham*, 357 F.3d at 936 (punctuation

- 11 -

modified). "Because no one factor is dispositive, a court should balance the factors permitting personal pursuits against the factors restricting personal pursuits to determine whether the employee is so restricted that he is effectively engaged to wait." *Id.* (punctuation modified) "Of course, an employee need not have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject." *Id.*

In this case, there was no requirement that drivers remain on Renzenberger property while on-call. (Doc. 93, ¶ 64) Renzenberger did not dictate where the drivers should be or what they could do while on-call, but if they were called, they were required to arrive at the pick-up location promptly. (Doc. 93, ¶ 63, 65, 66, 67, 76) Kouba was never late himself, but others were fired for being late. (Doc. 131, p. 69, 79) On average, Kouba had one hour and seven minutes to arrive at the pick-up location. (Doc. 93, ¶ 76) However, to arrive on time, he had to leave home within 5 minutes of the call. (Doc. 131, p. 69) Kouba was called for a trip about five times per week, sometimes for two trips in one day. (Doc. 131, p. 68) On the other had, there were times that Kouba was not called for a few days at a time (Doc. 93, ¶ 77)

Kouba argues he should have been paid for on-call time when he was in the first, second, or third[2] position on the board. (Doc. 131, p. 84) When that occurred, he explains, the drivers were required to leave their personal vehicles at work and drive home in one of the company's vans. (Doc. 131, p. 84) This was so the drivers would have extra time to get to their pick-up location and not be late. Having the company van, however, limited the driver's freedom considerably because vans could not be used for personal use. (Doc. 131, p. 73) He was therefore confined to his house as a practical matter. Kouba asserts that because he had only five minutes to leave home once he received a call, he could not do any task that could not be interrupted. For example, he could not do laundry in the laundry building near his hotel room.

---

[2] The court notes that in the Complaint, Kouba claimed he was entitled to payment when he was in the first or second position.

- 12 -

1  (Doc. 131, p. 75) He could not cook a hot meal or see a movie. (Doc. 131, 74-75) Kouba
2  estimates he would wait approximately two hours if he were in the first or second position on
3  the board, but sometimes he would be waiting as many as 12 hours. (Doc. 93, ¶ 61) Kouba
4  further asserts that drivers could not trade trips with others. (Doc. 131, p. 68) While in theory
5  they could be asked to be dropped to the bottom of the board, this practice was discouraged by
6  the supervisor. (Doc. 131, p. 80); *but see* (Doc. 93, ¶ 79)

Drawing all inferences in the light most favorable to the non-moving party, the court concludes that a reasonable finder of fact could return a verdict for the nonmoving party and find the on-call time compensable.[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, there is a genuine issue of material fact and Renzenberger is not entitled to summary judgment on this issue. *See, e.g., Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1535-36 (10th Cir. 1991) (On-call time was compensable where firefighters "were not required to remain on station house premises; the callbacks were frequent with a stated average of 3-5 callbacks per [24-hour] on-call period; firefighters were subject to discipline for late or missed calls; secondary employment was difficult due to the restrictive nature of the on-call status; City [was] the primary beneficiary of the on-call program; and, firefighters presented evidence that they were effectively precluded from engaging in group activities or from activities requiring the expenditure of money because they must report within 20 minutes of being called.")

Renzenberger argues that the fairly generous response time here (in excess of one hour) is typical of those cases wherein on-call time was not judged compensable. In those cases, however, the size of the response time dictated the range within which the employee could travel and still arrive at work on time when called. *See Berry v. County of Sonoma*, 30 F.3d 1174, 1185 (9th Cir. 1994) Here, Kouba presents evidence that he was required to surrender

---

[3] The court notes that the term "compensable" is problematic in this case. As the court discusses below, Kouba was not paid by the hour. Accordingly, his on-call time would really become compensable only if the addition of his on-call time changed the amount of overtime pay that Kouba was entitled to.

- 13 -

his vehicle, drive a company van home, and wait there for a call. The large response time in this case gives the drivers no greater freedom because they do not have the practical ability to leave their houses. Similarly, the fact that the drivers were permitted to use cell phones or permitted to be anywhere while on-call, even outside the city, is of no practical benefit to the drivers who are for all intents and purposes confined to their homes.

<u>Discussion: Pre-Trip Inspection and Post-Trip Refueling beginning January 1, 2009</u>

Kouba claims he is entitled to extra payment for his time spent performing pre-trip inspections and post-trip van refueling. Renzenberger argues it is entitled to summary judgment on this claim for the period after January 1, 2009. Renzenberger is correct.

Kouba presents no evidence that he is entitled to extra payment for his time spent performing pre-trip inspections and post-trip refueling. Renzenberger maintains that the trip wage was intended to cover these activities. Kouba spends many pages arguing that there is no evidence in the handbook that this was Renzenberger's intention. Kouba, however, has it exactly backward. Kouba is the plaintiff and therefore *he* has the burden of proving that he was owed extra payment that Renzenberger failed to pay him. Nothing in the employee handbook indicates that Kouba was to be paid extra for pre-trip inspections and post-trip refueling. In fact, Kouba presents evidence that he and his fellow drivers knew they were not being paid extra and complained to management. (Doc. 131, p. 24)

The only way Kouba could be paid extra for pre-trip inspections and post-trip refueling without an agreement is if these tasks caused him to work over 40 hours per week or caused his weekly payment to fall below the minimum wage. And, since January 1, 2009, Renzenberger has already been making these adjustments. (Doc. 93, ¶ 81)

Kouba presents no evidence that he is entitled to extra payment for his time spent performing pre-trip inspections and post-trip refueling. Renzenberger's motion for summary judgment on this claim for the time period after January 1, 2009, should be granted.

Discussion: Pre-Trip Inspection and Post-Trip Refueling and Overtime before January 1, 2009

Before January 1, 2009, Renzenberger did not pay overtime to its road drivers. (Doc. 93, ¶ 80) In his Complaint, Kouba claims he is owed overtime pay for time worked in excess of 40 hours per week including time spent performing pre-trip inspections and post-trip refueling. Renzenberger estimates that these extra tasks could have taken up to 2.7 hours per week (excepting his training week). (Doc. 93, ¶ 91) Assuming that Kouba is covered by the FLSA, Renzenberger calculates he is owed overtime pay of $399.00. (Doc. 93, ¶ 92) Assuming again that the treble damages provision of A.R.S. § 23-355 applies, Renzenberger calculates Kouba's maximum damages amount would be $1,197.00 plus interest. (Doc. 92, p. 17) In its motion, Renzenberger argues it is entitled to partial summary judgment to the effect that Kouba's monetary damages cannot exceed this figure. Kouba, concedes that this figure is correct. (Doc. 131, p. 6)

Renzenberger's motion for partial summary judgment on this claim should be granted. Kouba's maximum compensation from this claim cannot exceed $1,197, plus interest.

RECOMMENDATION:

The Magistrate Judge recommends the District Court, after its independent review of the record, enter an order

GRANTING Renzenberger's motion to strike. (Doc. 137) The Clerk should be instructed to STRIKE Kouba's motion to add an addendum and the addendum. (Docs. 135, 136)

GRANTING Renzenberger's motion to strike the sur-reply. (Doc. 143) The Clerk should be instructed to STRIKE Kouba's sur-reply. (Doc. 142)

GRANTING Renzenberger's motion for summary judgment in part (Doc. 92) and GRANTING Kouba's motion to deny in part. (Doc. 131) Renzenberger's motion should be granted on the sexual harassment claim and the wages claim beginning January 1, 2009. Partial

summary judgment should be granted on the wages claim before January 1, 2009. Kouba's damages cannot exceed exceed $1,197, plus interest. Renzenberger's motion should be denied on the on-call claim.

Pursuant to 28 U.S.C. §636 (b)(1), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived.

The Clerk is directed to send a copy of this Report and Recommendation to the parties or their counsel.

DATED this 12th day of September, 2011.

_____
Glenda E. Edmonds
United States Magistrate Judge